UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DAVE NEIL SPEEDIE,<br><br>Petitioner,<br><br>v.<br><br>ALEXI DAWN SPEEDIE,<br><br>Respondent. | CASE NO. 2:26-cv-00345-JHC<br><br>ORDER |

## I

## INTRODUCTION

This matter comes before the Court on Verified Amended Petition for Return of Children to Canada & For Expedited Relief (the Petition), filed by Petitioner Dave Neil Speedie under the Hague Convention on the Civil Aspects of International Child Abduction. Dkt. # 26. Petitioner alleges that Respondent Alexi Dawn Speedie wrongfully removed the children to the United States in August 2025. The Petition seeks the return of the minor children L.S. and I.S. to British Columbia. Respondent has filed an Answer to the Petition, contending that the children's habitual residence is not Canada, but even if it were, any return there would pose a grave risk to them, an exception to return under the Convention. *See* Dkt. # 32.

The Court held an evidentiary hearing on the Petition from June 2 to June 4, 2026. Dkt. ## 76, 78, 79. Both parties were represented by counsel. The Court heard testimony from Petitioner, Respondent, Oliver Speedie (Petitioner's adult son of a prior marriage), Lorri Swatsky (Petitioner's mother), Dr. Jayme Dee Fergoda (mental health professional), A.N. (Respondent's minor daughter of a prior marriage), Nancy Johnson (Respondent's mother), and Dr. Landon Poppleton (expert witness called by Respondent), and Dr. Peter Favaro (expert witness called by Petitioner). The Court also admitted various exhibits into evidence.[1]

For the reasons below, the Court DENIES the Petition.

## II
## FACTUAL FINDINGS

### A. Background

1. Petitioner is a Canadian citizen. Dkt. # 92 at 36:4–5. Respondent is an American citizen and permanent resident of Canada. Dkt. # 93 at 326:8–9; Dkt. # 94 at 409:22–23.

2. The parties met online on a dating site and then in person in Bellingham, Washington in 2016 or 2017. Dkt. # 92 at 24:14–25:2; Dkt. # 93 at 327:1–2.

3. When they met, Petitioner had two children from a previous marriage, Oliver Speedie (age 19) and C.S. (age 16). Dkt. # 92 at 25:10–25, 111:1–2. Respondent also had two children, A.N. (age 17) and K.N. (age 12). Dkt. # 93 at 328:11–16. These four children are not the subject of this Petition.

4. Petitioner and Respondent were married in Fort Langley, British Columbia, Canada, on February 20, 2017. *Id.* at 327:3–10; Dkt. # 58 at 3.

---

[1] All exhibits are cited as either "Pet. Ex." or "Resp. Ex." All exhibits cited herein were admitted at the evidentiary hearing. *See* Dkt. # 81.

5. In May 2017, Respondent applied for permanent residency in Canada. Dkt. # 94 at 407:12–18. Petitioner was Respondent's sponsor. *Id.* at 408:5–6. As part of the process, Respondent testified that she wanted to permanently reside in Canada. *Id.* at 408:24–409:11. At the evidentiary hearing, she testified that she would have preferred to stay in the United States but chose to follow her husband. *Id.* at 408:19–23. Canada granted Respondent permanent residency on March 19, 2019. *Id.* at 409:22–23.

6. The parties resided in Chilliwack, British Columbia, Canada from June 2017 until October 2020. Dkt. # 93 at 327:4–25. At that time, the parties resided with their children: Oliver, C.S., A.N., and K.N. *Id.* at 328:16–22, 331:11–16.

7. Also at that time, there was a custody order in place for A.N. and K.N. to see their biological father, which required them to travel to Washington every other weekend. *Id.* at 308:22–309:1, 328:17–23.

8. The parties' first child, L.S., a boy, was born in 2018, at St. Joseph's Hospital in Bellingham, Washington, where Respondent's obstetrician and family were located. Dkt. # 92 at 29:7–18, 33:7–10; Pet. Ex. 1; Dkt. # 93 at 333:18–334:8. The parties and L.S. spent approximately 15 days in Washington before traveling back to their residence in Chilliwack. Dkt. # 92 at 31:13–17.

9. In October 2020, the parties and their children moved from Chilliwack to Kimberley, British Columbia, where they lived from 2020 to 2022. *Id.* at 27:11–22, 35:4–6.

10. In 2022, the parties moved to an off-grid, 42-acre property in Ta Ta Creek, British Columbia, Canada. *Id.* at 35:4–7, 37:4–8; 38:2–9; Dkt. # 93 at 270:14–16.

11. From May 2022 until August 2023, the family lived in an RV on the property. Dkt. # 93 at 337:17–18. The RV was small enough that one could see from one end to the other. *Id.* at 314:10–18.

12. During the spring and summer of 2023, the family constructed a cabin on the property to serve as their home. *Id.* at 337:21–338:2; *see also* Dkt. # 92 at 62:22–63:8. Respondent's extended family members traveled from Oregon to Canada to help build the cabin. Dkt. # 93 at 313:17–25; Pet. Ex. 9.

13. The property lacked running water, which the family would either truck in or acquire from a local gas station. Dkt. # 93 at 337:5–11. For electricity, the family sometimes used a generator that could run for about six to eight hours before it needed recharging. *Id.* at 336:21–25. The cabin lacked a refrigerator, and the family cooked on a wood stove. *Id.* at 337:1–4. The cabin was heated by propane heaters. *Id.* at 337:12–13. The cabin did have internet and telephone service. Dkt. # 92 at 53:4–17.

14. The cabin had approximately 380 square feet. Dkt. # 93 at 335:19–25. It consisted of a kitchen and living area on the first floor, and two rooms on the second floor. *Id.*; *id.* at 270:19–271:7. The family used an outhouse as a bathroom. Dkt. # 92 at 38:2. The second floor consisted of a lofted space in which the children slept, in separate beds, and a separate bedroom for Petitioner and Respondent. *Id.* at 129:11–19; Dkt. # 93 at 270:19–271:7.

15. In 2024, Respondent gave birth to the parties' second child, I.S., a girl, also at St. Joseph's Hospital in Bellingham, Washington. Dkt. # 92 at 32:5–33:15; Pet. Ex. 2; Dkt. # 93 at 334:14–16. The parties and I.S. spent approximately 15 days in Washington before traveling back to the family home in Ta Ta Creek. Dkt. # 92 at 33:16–22.

16. L.S. and I.S. are dual citizens of Canada and the United States. *Id.* at 36:6–10.

17. Before the events leading up to the Petition, the children spent most of the year in Canada. *Id.* at 32:1–4. For several years in a row, Respondent and the children—but not Petitioner—would spend the winter with Respondent's parents in Washington, which

Respondent's mother attributed to "habitability issues" in the Ta Ta Creek cabin. Dkt. # 94 at 447:8–20, 407:2–6.

18. Both parties were the primary caretakers of the children. Dkt. # 92 at 46:20–24, 111:9–13. Except for the irregular part-time jobs Petitioner worked to financially support the family on an as-needed basis, both parties stayed at home to raise the children together. *Id.* at 54:8–14, 67:12–25, 112:13–23.

19. The children participated in online schooling for which they did not attend any live classes. Dkt. # 93 at 309:24–310:12, 311:20–25. They instead received assignments and sent the completed assignments back to the online program. *Id.*

20. The children have extended family in Canada, including their older sibling Oliver, with whom they are close, *id.* at 176:24–177:21, their paternal grandmother, their paternal grandfather and step-grandfather, and their paternal uncle. *Id.* at 191:16–192:8, 196:1–5, 351:5–352:13.

21. L.S. had friends in Canada and would play soccer in a nearby town. Dkt. # 92 at 177:24–178:3.

B. Petitioner's Conduct

22. From about 2024 to June 6, 2025, during the family's residence in Ta Ta Creek, Petitioner routinely drank about six beers over 16 hours a day. *Id.* at 44:12–15. Save for one occasion, he stopped drinking after June 6, 2025. *Id.* at 44:23–45:9. As Petitioner testified, he has "decided never to drink again." *Id.* at 45:6–46:16, 122:1–123:22.

23. From about April to June 2025, Petitioner experienced what he described as "blackouts," both when sober while experiencing stress and after he had consumed alcohol. *Id.* at 119:17–120:15, 173:20–22; Resp. Ex. 502 at 2. Petitioner described these blackouts as experiences of amnesia, when he would be in and out of consciousness. *Id.* at 121:8–10, 173:22.

24. The Court finds that Respondent and A.N. testified credibly to recurring incidents of physically abusive or aggressive behavior by Petitioner.

25. Throughout the parties' marriage, there were incidents of Petitioner destroying property, such as punching through a microwave (Dkt. # 94 at 378:4-7), punching holes through the drywall (*id.* at 379:5–7), damaging electronics with a knife and fist (*id.* at 379:8–11), and shooting outdoor furniture and vehicles (*id.* at 380:21–381:8).

26. On one occasion when the family went on a bike ride together, Petitioner became frustrated and angry with L.S. when teaching the child how to ride a bicycle. Dkt. # 93 at 273:17–274:21. Petitioner stormed away from L.S. and the rest of the family and remained very quiet through dinner. *Id.* at 273:25–275:14.

27. Later that night, after the children had been tucked in to bed, Respondent started playing music loudly. *Id.* at 276:3–6. Petitioner then called L.S. downstairs because the child was ripping insulation out of the wall and throwing it down the stairs. Dkt. # 92 at 148:1–3. After L.S. went back upstairs, Petitioner dragged six-year-old L.S. from his bed, sat him on a bin and screamed in his face that he was a "traitor," slapped him across the face at least twice, which knocked him off the bin where he was forced to sit, and kept hitting him until Respondent intervened; the event caused L.S. to wet his pants. Dkt. # 93 at 276:3–277:22; Dkt. # 94 at 389:17–25.

28. In Petitioner's characterization of the incident, he described L.S. as "acting as though he was demon possessed." Dkt. # 92 at 145:9–15. Petitioner attributed the incident to the influence of Respondent, who he said would experience "delusions a lot of times where demons were supposedly coming in through the windows or trying to come in through the door." *Id.* The family prayed over L.S. Dkt. # 93 at 278:18–19. Petitioner testified that "the spanking didn't budge [L.S.] in his attitude or his demeanor." Dkt. # 92 at 150:24–25. Petitioner

characterized the spanking as "[t]hree slaps on the bottom, clothed, not hard." *Id.* at 151:5–6. The Court finds Petitioner's testimony less credible than Respondent's and A.N.'s.[2]

29. One week later, L.S. ran away. Dkt. # 94 at 388:24–389:3. On prior occasions when L.S. had run away, Petitioner had hit him. *Id.* at 389:15–16. On one such occasion, while hitting L.S., Petitioner said that if L.S. was going to be a "tough guy" who would "stand up to dad," maybe he (i.e., Petitioner) "should just take [L.S.] and put him in the middle of town and leave him," causing L.S. to wet his pants. *Id.* at 390:2–9.

30. Petitioner also acted violently with C.S. and Oliver. He would strike C.S. across her legs and arms if she did not disclose to him the details of her visits to her stepmother's house. Dkt. # 93 at 365:16–366:12.

31. On another occasion, Respondent observed Petitioner throw Oliver over a couch, causing a cut that bled. *Id.* at 367:2–8. Oliver testified that he had never suffered an injury from a physical altercation with his Petitioner. Dkt. # 92 at 183:12–14. But Oliver testified that in the winter of 2024, during another altercation, Petitioner put his (i.e., Oliver's) head on a chopping block. *Id.* at 183:15–184:23. The Court finds Oliver's testimony to be credible, suggesting that Petitioner would act violently with him. Furthermore, on August 6, 2025, in an email to Respondent, Petitioner said, "I think of Ollie and how terrible it was that I put his head to the chopping block. . . . Forgive me my anger. Forgive me my rage." Resp. Ex. 531 at 1.

32. Petitioner also struck the parties' infant daughter I.S. On Mother's Day weekend 2025, annoyed by seven-month-old I.S.'s colicky crying, Petitioner took the baby from Respondent, spanked her three times, put her in her crib screaming, physically forced

[2] The Court notes that, whenever Petitioner's testimony conflicted with that of Respondent or A.N. on a material fact, the Court considered Respondent's and A.N.'s testimonies to be more credible. This was due to a number of factors, including their consistency with the other evidence in the case (e.g., their testimony about Petitioner's behavior tracked his written communications), their demeanor, and how they comparatively held up on cross-examination.

Respondent out of the cabin, and stood in front of the door so that Respondent could not reach her infant. Respondent hid in the woods with L.S., who was hiding in the bushes, listening to the baby scream. Dkt. # 94 at 390:12–391:13. L.S. apparently thus observed the abusive interaction.

33. Petitioner punched the family dog "until it submitted" a couple of times per month. Dkt. # 93 at 361:11–362:23. Once, after the dog nipped at him, Petitioner threw the dog down a full flight of stairs in the presence of the children. He then yelled to the children, "[e]verybody come say goodbye to the dog[,] I'm going to shoot him." The children then heard a gunshot, and later saw that the bullet had clipped the dog's paw. A.N. and Respondent concealed the dog's injury so Petitioner would not "shoot the dog properly." *Id.* at 280:13–284:24.

34. Petitioner discharged firearms to "blow[] off steam" while drinking, shooting at the patio furniture, the family van, and the outhouse (leaving bullet holes at eye-level had a person been seated inside) while the children were present. Dkt. # 94 at 380:16–381:12; Resp. Ex. 518. He took an ax to the kitchen counter because "it was looking at me funny," Dkt. # 94 at 380:1–12; Resp. Ex. 511, punched through a microwave and through drywall, stabbed and stomped electronics, threw furniture and dishes through a window, and destroyed the family television. Dkt. # 94 at 377:25–379:18; Dkt. # 93 at 361:14–22, 284:12–14.

35. The Court also finds that Respondent and A.N. also testified credibly to certain incidents in which Petitioner sexually harassed or assaulted them.

36. When A.N. was 14, Petitioner rubbed and squeezed her breasts under her clothing and bra on repeated occasions. Dkt. # 93 at 297:23–298:14. When she asked him to stop, he would stop "[f]or a short amount of time, and then he conveniently forgot." *Id.* at 298:15–19.

On one occasion, he put his hand down her pants beneath her underwear. *Id.* at 296:10–297:6. She pulled his hand away about four times before he stopped. *Id.* at 297:11–16.

37. Petitioner once commented on A.N.'s "perfect" body and breasts in her presence and L.S.'s, chasing her in attempts to kiss her, and slapping her buttocks at a public laundromat. Dkt. # 94 at 387:1–23; Dkt. # 93 at 299:10–300:8. That night, on June 4, 2025, Petitioner handed Respondent a clipboard on which he had written "[A.N.] is sex," and ranted within earshot of the children for about 45 minutes that A.N. was a "whore" and a "slut" and that he should "strip her naked and tie her to a pole" in the backyard. Dkt. # 94 at 391:14–393:5 (Respondent's testimony); Dkt. # 93 at 300:18–301:16 (A.N.'s testimony). The Court finds this testimony to be credible.

38. Petitioner denied touching A.N. in any inappropriate or sexual way. Dkt. # 92 at 39:20–40:19; Dkt. # 94 at 543:12–16. Petitioner testified that he would lie beside A.N. in her bed, rubbing her bare belly under her shirt, and commenting on her "butt" and chest, which he attributed to an attempt to counsel her through puberty. Dkt. # 92 at 131:4–21, 132:14–133:14, 136:14–137:9. The Court does not find Petitioner's testimony credible in light of A.N.'s and Respondent's testimony.

39. Respondent testified that on two occasions, Petitioner had sex with her without her consent. Dkt. # 94 at 385:6–386:17. On the first occasion, Petitioner forced Respondent inside the RV and forced himself on her after a struggle. *Id.* at 385:15–25. On another occasion, he led Respondent outside and again forced himself on her, though on that occasion she opted not to fight him. *Id.* at 386:6–13. Petitioner denied ever sexually assaulting Respondent. Dkt. # 92 at 43:10–12, 43:25–44:4. He testified that before April 21, 2026 (after he had filed his Petition in this Court), he was unaware of any allegations ever made against him about sexually

abusing anyone. *Id.* at 83:7–12. The Court finds Respondent's testimony to be credible in light of her other testimony and A.N.'s testimony.

40. Respondent also stated there were at least five instances in which Petitioner threatened to kill her, and several other instances where he threatened to kill the children. Dkt. # 94 at 382:3–19. Petitioner made the threats only to her and never communicated those threats to the children themselves. *Id.* at 382:3–21.

41. Respondent and A.N. also testified that Petitioner would use foul or abusive language directed at them. Petitioner would call Respondent "stupid B word" "fat fuck," "lazy tit," and "useless." Dkt. # 93 at 362:4–13. This unkind language was "regular." *Id.* at 362:25–363:1.

42. On one occasion, three days after Respondent had taken a job at a candy shop, Petitioner screamed profanities in her face, declared "I have no wife," and did "donuts" in the driveway in his vehicle, leading her to quit. *Id.* at 339:12–340:12.

43. Petitioner would also call A.N. names such as "liar," "[t]raitor, whore, slut, brat, [and] asshole." *Id.* at 271:17–22. Petitioner denied ever emotionally abusing Respondent and A.N. Dkt. # 94 at 543:6–22. The Court finds Respondent's and A.N.'s testimony regarding Petitioner's language credible.

44. During the winter of 2024 into 2025, Petitioner would also text suicidal ideations to Respondent. *See* Pet. Ex. 15. In one series of text messages dated November 1, 2024, Petitioner wrote to Respondent, "Fuck. I need a bullet in the head. Fuck me. Seriously having a hard time right now. Eating a ficking 12hauge [sic] slug sounds pretty good right now." Pet. Ex. 15 at 15. Respondent responded, "No bullets please. We'll figure this out like we always do." *Id.*

45. In another series of text messages from that same day, Petitioner wrote to Respondent, "Fucking [hell]. God just loves me so much he fucked my God damn head and made me a fucking retard. Fucking plagued my soul with demons and cursed everything I fucking touch. . . . He had to harass the fuck out of me so that whenever I'm alone I am bent on killing myself. . . . Fucking cunt…(not you). Him." *Id.* at 16. Respondent responded, "I love you so much Dave, truly I do. . . . You are an incredible Father, I'm so grateful to have you as my better half." *Id.* at 17. Later, Petitioner stated, "You want to drive off a cliff in the Saab with me? Grand Canyon?" *Id.* at 18.

46. On January 22, 2025, Petitioner sent a series of text messages to Respondent about wanting to "blow my brains out with a 357 magnum," starving himself to death, and other suicidal thoughts. *Id.* at 57. Respondent ultimately responded to Petitioner, "I'm here Dave, I love you. And our children love you. [I.S.] and [L.S.] both have been missing you. [A.N.] and [K.N.] both love you and miss you." *Id.* at 59.

47. At the evidentiary hearing, Petitioner acknowledged that sending the text messages "wasn't appropriate at all" and that he put Respondent "through a lot." Dkt. # 92 at 76:22–24, 78:23–24.

48. At a certain point, Respondent and the children devised a "red dot plan," to be used when Petitioner "started to get violent." Dkt. # 93 at 294:10–17. The plan was triggered by the placement of a red dot on the refrigerator indicating it was time to flee. *Id.* Petitioner testified that he had instructed Respondent to have the car packed and ready if he ever made her feel unsafe. Dkt. # 92 at 119:7–16.

C. Respondent's Retention of L.S. and I.S.

49. On the morning of June 6, 2025, Respondent told Petitioner that she needed a break from "the fear, the death threats." Dkt. # 94 at 394:9, 395:14–18. After going to her

vehicle, she found the car battery dead and the keys jammed in the ignition. *Id.* at 394:9–18. When Respondent returned to the cabin to get a battery to jump start the car, Petitioner emerged and said to her, “Got a dead battery, huh?” *Id.* at 395:2–6. Respondent took this to mean that Petitioner had sabotaged the car’s battery. *Id.* Petitioner then jumped the car. *Id.* at 395:7–11. As he did so, he began “ranting” that Respondent was “going to take the kids away from daddy” and that they would never see him again. *Id.*

50. Respondent then drove herself and A.N., K.N., L.S., and I.S. to the United States. *Id.* at 394:3–7, 396:10–11, 443:20–444:9.

51. As Respondent and the children left, Petitioner drove his own car across the property; hit another car, a rock sifter, a work bench, and an embankment; then chased the family’s car up the driveway, mocking them, while K.N. and L.S. cried in the backseat. *Id.* at 396:12–397:24; Dkt. # 93 at 291:14–292:19; Dkt. # 92 at 180:5–18.

52. On June 12, 2025, after Respondent arrived in the United States, she reported Petitioner’s conduct to the Royal Canadian Mounted Police. Dkt. # 94 at 398:3–16.

53. Petitioner suggested that he understood that his behavior during the preceding months informed Respondent’s decision to leave temporarily, and he used that time to reflect things and make drastic changes in his life. Dkt. # 92 at 173:18–24. Petitioner sold all the family’s firearms. *Id.* at 77:15–24. He also contacted a psychologist, started attending therapy, and continues to attend therapy. Dkt. # 94 at 547:4–548:23; Pet. Ex. 18.

54. Also on June 12, 2025, Petitioner messaged his mother, “[Respondent] fled to the USA for her safety. I’ve gone nuts. Something snapped and I lost my family. . . . I’m a fuck head with a Hell fire in me.” Resp. Ex. 502 at 1. In the same series of messages, he said, “Apparently when I hit a certain amount of stress I black out and go crazy. I have barely any memories of it. . . . I have next to no memories of anything. . . . I should have just gone on a

killing spree and got it out of my system. . . . I've had so much hate and I cannot contain it. It's found a way out." *Id.* at 2–7.

55. Petitioner originally "gave [Respondent] five months of space voluntarily" and delivered the family's clothing, personal items, and comfort items to Washington. Dkt. # 94 at 548:4–5, 549:14–17, 551:3–5. Petitioner did not agree to the children staying in the United States. Dkt. # 92 at 31:25–32:5.

56. Petitioner sent Respondent many emails from June to August 2025 inquiring about the children and discussing their marriage. *See* Pet. Ex. 16. Respondent replied to these emails once on August 6, 2025, writing, "[t]he Lord has taken the kids and I away from you . . . . We will not be returned to you until He appoints it." Pet. Ex. 16 at 26.

57. Petitioner contacted A.N. at least once. In a handwritten letter to her, he wrote, "How could I have attacked you and hurt you?! I cannot make sense of it and the madness thats come out of my mouth. . . . [B]ut it was not just once. I am without excuse. You did nothing wrong. You did not deserve any of it. . . . It was my job to protect you, not attack you." Resp. Ex. 508; Dkt. # 92 at 165:15–166:8, 168:16–25.

58. Petitioner also contacted Respondent to wish L.S. a happy birthday. Pet. Ex. 16 at 1.

59. In October and November 2025, Petitioner and Respondent were parties to a hearing at a Whatcom County court. *See* Dkt. # 92 at 87:23–88:10. Respondent testified that at this hearing, the record of which was not admitted into evidence, she sought and obtained a domestic violence protection order. *See* Dkt. # 94 at 400:1–12.

60. Petitioner then filed a Petition for Return of Children to Canada under the Hague Convention on January 26, 2026. Pet. Ex. 22.

61. Upon retaining pro bono counsel, Petitioner filed a Verified Amended Petition for Return of Children to Canada & For Expedited Relief on April 21, 2026. Pet. Ex. 23; Dkt. # 92 at 82:13–23.

62. An evidentiary hearing in this matter was held for three days from June 2 to June 4, 2026.

## III

## CONCLUSIONS OF LAW

### A. Hague Convention Standards

63. This action arises under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 49 (the Convention). The Convention is implemented in the United States by the International Child Abduction Remedies Act (ICARA), 22 U.S.C. § 9001 *et seq*. The Court has jurisdiction under 22 U.S.C. § 9003(a)–(b); the children, both under 16, are located in this District, and the Convention is in force between the United States and Canada.

64. The Convention was adopted to address and discourage "the problem of international child abductions during domestic disputes." *Lozano v. Montoya Alvarez*, 572 U.S. 1, 4 (2014) (citation modified). It is intended "to secure the prompt return of children wrongfully removed to or retained in any Contracting State," and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Convention, art. 1. Thus, it generally seeks to restore the pre-abduction status quo. *Holder v. Holder*, 305 F.3d 854, 869 (9th Cir. 2002). "The Convention's central operating feature is the return remedy." *Colchester v. Lazaro*, 16 F.4th 712, 717 (9th Cir. 2021) (quoting *Abbott v. Abbott*, 560 U.S. 1, 9 (2010)).

65. To be entitled to return under the Convention, a petitioner must prove by a preponderance of the evidence that the child was habitually resident in the petitioner's country immediately before the removal or retention, that the removal or retention breached their custody rights under that country's law, and that they were exercising those rights. *See* 22 U.S.C. § 9003(e)(1)(A); Convention, art. 3. "Habitual residence" is a totality-of-the-circumstances determination. *Monasky v. Taglieri*, 589 U.S. 68, 71 (2020); *Nisbet v. Bridger*, 124 F.4th 577, 588 (9th Cir. 2024).

66. The analysis of a petitioner's prima facie case for return is thus distilled into a four-part inquiry:

a. When did the retention at issue take place?

b. Just before the retention, in which state were the children habitually resident?

c. Did the retention breach the rights of custody attributed to the petitioner under the laws of the children's habitual residence?

d. Was the petitioner exercising those rights at the time of the retention?

67. The Court may decline to return the children only if a respondent establishes one of the Convention's narrow discretionary exceptions to return. Convention, arts. 12, 13; 22 U.S.C. § 9003(e)(2). In this case, Respondent has asserted one defense in her Answer: the Convention's Article 13(b) grave risk defense. *See* Dkt. # 32 at 7–8. Respondent must prove her grave risk defense by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A).

B. Petitioner's Prima Facie Case

*Date of retention*

68. The date of retention here–August 6, 2025—is uncontroverted. Respondent retained the children in Washington on August 6, 2025, when she emailed Petitioner, "[t]he Lord

has taken the kids and I away from you," and stated she would not return the children to Canada. Pet. Ex. 16 at 26. The habitual residence analysis therefore centers on this date.

*Habitual residence*

69. To determine habitual residence, a court considers the totality of the circumstances. *Monasky*, 589 U.S. at 71. In its discussion of habitual residence, the Supreme Court in *Monasky* stated that, in general, a child "resides where she lives." *Id.* at 76 (citation modified). "Because locating a child's home is a fact-driven inquiry, courts must be 'sensitive to the unique circumstances of the case and informed by common sense.'" *Id.* at 78 (quoting *Redmond v. Redmond*, 724 F.3d 729, 744 (7th Cir. 2013)).

70. No single fact is dispositive across all cases. *Id.* For older children, "facts indicating acclimatization will be highly relevant." *Id.* Such facts include:

> [G]eography combined with the passage of appreciable periods of time, age of the child, immigration status of child and parent, academic activities, social engagements, participation in sports programs and excursions, meaningful connections with the people and places, language proficiency, and location of personal belongings.

*Nisbet*, 124 F.4th at 584 (citing *Monaksy*, 589 U.S. at 78 n.3) (citation modified). For younger children, "the intentions and circumstances of caregiving parents are relevant considerations." *Monasky*, 589 U.S. at 78; *Nisbet*, 124 F.4th at 584. "[A] wide range of facts other than an actual agreement, including facts indicating that the parents have made their home in a particular place, can enable a trier to determine whether an infant's residence in that place has the quality of being 'habitual.'" *Monasky*, 589 U.S. at 81. "Common sense suggests that some cases will be straightforward: Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence." *Id*. at 78.

71. The Court concludes that before August 6, 2025, the habitual residence of L.S. and I.S. was Canada.

72. The children predominantly lived in Canada, except for periods in the winters from 2022 to 2025, which they spent in Washington.

73. The children have relationships with extended family members in Canada, including their paternal grandmother, paternal grandfather, paternal step-grandfather, and paternal uncle. The children have half-siblings in Canada, including their older brother Oliver. L.S. participated in sports and attended online school based in Canada. The family built a home on a 42-acre property in Ta Ta Creek, Canada in 2023. Respondent's extended family traveled from Oregon to Canada to participate in building the new home.

74. Based on the totality of the circumstances, the children have acclimatized in Canada. The children (i) lived in Canada their entire lives; (ii) are Canadian citizens; (iii) established meaningful familial connections in Canada; (iv) participated in an online Canadian school program; (v) played soccer in Canada; (vi) lived in a home the parents built in Canada; (vii) had a settled routine in Canada; and (viii) are fully involved and integrated in all aspects of daily and cultural life in Canada. Canada is therefore the children's habitual residence and was their habitual residence on the date of retention.

75. Respondent challenges Petitioner's habitual residence case, pointing to the extended stays in Washington, the precarity of their living situation in Ta Ta Creek, and their access to medical care in the United States. The Court also notes that I.S., as an infant and then a toddler, had fewer social connections in Canada. But these factors, while true, do not outweigh the depth of the other connections that L.S. and I.S. had in Canada.

*Rights of custody and the exercise of rights of custody*

76. After determining habitual residence, the Court then considers whether Petitioner had rights of custody to the children at the time of the wrongful retention. Convention, art. 3. Whether a petitioner has rights of custody to a child is determined based on the law of the child's

habitual residence. *Id.* This element was uncontested at the evidentiary hearing. Petitioner's Affidavit of Canadian Law was uncontroverted and establishes that Petitioner has rights of custody to the children under British Columbia law. Pet. Ex. 29; *see also* Convention, art. 14; Fed. R. Civ. P. 44.1; *Whallon v. Lynn*, 230 F.3d 450, 458 (1st Cir. 2000) (courts may consider affidavits of foreign law to establish rights of custody). Petitioner had rights of custody to the children under British Columbia law on the date of retention.

77. The final element of Petitioner's prima facie case is that his rights of custody were being exercised at the time the children were retained or would have been exercised but for the retention. Convention, art. 3(b). A parent is generally deemed to be exercising custody rights when that parent "keeps, or seeks to keep, any sort of regular contact with his or her child." *Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6th Cir. 1996). Rights of custody are only to be considered not exercised by a petitioner if the child has been abandoned. *In re ICJ*, 13 F.4th 753, 762 (9th Cir. 2021); *see also Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 345 (5th Cir. 2003). There is no evidence here that Petitioner abandoned the children. While Petitioner limited his contact with them for five months after the retention, he did maintain contact with Respondent and endeavored to convince her to return with the children to Canada. The Court does not believe that the space he afforded the children amounts to abandonment. Thus, Petitioner was exercising his rights of custody at the time of the retention.

78. Petitioner has met his prima facie burden to establish Respondent wrongfully retained the children from Canada in the United States.

C. Article 13(b) Grave Risk Exception

79. There are certain narrow discretionary exceptions to return under the Convention that may be asserted by a respondent seeking to prevent a child's return to the child's habitual

residence. *See* Convention arts. 13, 14, 20. The only exception Respondent asserted is the Convention's Article 13(b) grave risk exception. *See* Dkt. # 32 at 7–8.

*Standard for grave risk exception*

80. Under the grave risk exception, a court considering a petition under the Convention need not order return where the respondent establishes, by clear and convincing evidence, "a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Convention, art. 13(b); 22 U.S.C. § 9003(e)(2)(A); *Colchester*, 16 F.4th at 717–18. "The gravity of a risk involves not only the probability of harm, but also the magnitude of the harm if the probability materializes," and while the exception is narrow, "the safety of children is paramount." *Van De Sande v. Van De Sande*, 431 F.3d 567, 570, 572 (7th Cir. 2005). But the Ninth Circuit has "repeatedly stated that the grave risk exception is 'narrowly drawn' so 'as not to impair the Convention's general policy.'" *Colchester*, 16 F.4th at 718 (quoting *Cuellar v. Joyce*, 596 F.3d 505, 509 (9th Cir. 2010)).

81. Thus, to prevail on a grave risk exception, Respondent must establish by clear and convincing evidence that there is a grave risk that returning the children to Canada would expose the children to physical or psychological harm or otherwise place the children in an intolerable situation. Convention, art. 13(b); 22 U.S.C. § 9003(e)(2)(A). To meet the clear and convincing evidence standard, a party "must present sufficient evidence to produce in the ultimate factfinder an abiding conviction that the asserted factual contentions are highly probable." *OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, 897 F.3d 1008, 1020 (9th Cir. 2018) (citation modified).

82. A respondent can establish grave risk "where the petitioning parent had actually abused, threatened to abuse, or inspired fear in the children in question." *Colchester*, 16 F.4th at

718 (quoting *Ermini v. Vittori*, 758 F.3d 153, 164 (2d Cir. 2014)). "Spousal violence may also 'establish a grave risk of harm to the child, particularly when it occurs in the presence of the child.'" *Id.* (quoting *Ermini*, 758 F.3d at 164).

83. Allegations of sporadic physical and verbal abuse between spouses have not been found to rise to the level of grave risk needed to satisfy Article 13(b). *See Whallon*, 230 F.3d at 460 (affirming the lower court's finding that the alleged instances of verbal abuse of the respondent and her older daughter, of physical abuse of the respondent, and of the alleged psychological harm to the child from the abuse witnessed did not rise to the level required for sustaining an Article 13b exception and that "[t]o conclude otherwise would risk substituting a best interest of the child analysis for the analysis the Convention requires.").

84. Rather, grave risk sits on a spectrum:

> First, there are cases in which the abuse is relatively minor. In such cases it is unlikely that the risk of harm caused by return of the child will rise to the level of a "*grave* risk" or otherwise place the child in an "*intolerable* situation" under Article 13b. . . . Second, at the other end of the spectrum, there are cases in which the risk of harm is clearly grave, such as where there is credible evidence of sexual abuse, other similarly grave physical or psychological abuse, death threats, or serious neglect. . . . Third, there are those cases that fall somewhere in the middle, where the abuse is substantially more than minor, but is less obviously intolerable. Whether, in these cases, the return of the child would subject it to a "grave risk" of harm or otherwise place it in an "intolerable situation" is a fact-intensive inquiry that depends on careful consideration of several factors, including the nature and frequency of the abuse, the likelihood of its recurrence, and whether there are any enforceable undertakings that would sufficiently ameliorate the risk of harm to the child caused by its return.

*Simcox v. Simcox*, 511 F.3d 594, 607–08 (6th Cir. 2007) (citation modified).

85. For example, a sustained pattern of physical abuse or a propensity for violent abuse can establish grave risk. *See e.g.*, *Walsh v. Walsh*, 221 F.3d 204, 219–21 (1st Cir. 2000) (finding grave risk of harm where petitioner had severely beaten his wife over a number of years,

including while she was pregnant, in front of the children, and petitioner had a history of other violent activity and of chronic disobedience of court orders).

86. "And even when the respondent establishes that a grave risk of harm exists, the court may still order the child's return if it determines there are ameliorative measures that would allow both the return of the child to his or her home country and the child's protection from harm." *Colchester*, 16 F.4th at 718 (quoting *Gaudin v. Remis*, 415 F.3d 1028, 1035 (9th Cir. 2005)) (citation modified); *see also Golan v. Saada*, 596 U.S. 666, 678 (2022).

*Analysis of grave risk*

87. In light of the testimony adduced at trial, and the admitted exhibits, the Court concludes that Respondent has established, by clear and convincing evidence, that the children would be exposed to a grave risk of physical and/or psychological harm if they were to return to Canada.

88. Credible testimony adduced at trial—alongside the admitted exhibits—established that Petitioner would be violent with the children. While Petitioner characterized his own physical discipline as an appropriate level of spanking of children, testimony from Respondent and other witnesses, including A.N. and Oliver, suggests that the physical discipline went beyond something normal. On multiple occasions, Petitioner subjected L.S. to verbal and physical abuse, such as the incident following the bike ride where he slapped L.S. twice across the face while calling him a traitor. Petitioner struck the infant I.S. while preventing Respondent from intervening; this conduct was apparently observed by L.S. And the Court also heard testimony from both parties regarding the placing of Oliver's head on a chopping block, which strikes the Court as a particularly violent incident through the clear implication it presents. While Petitioner characterizes these incidents as sporadic, the Court disagrees. And Petitioner's citation to *Whallon v. Lynn* is not well-taken. There, the respondent did not allege that the

petitioner had physically or verbally abused the child at issue. *See Whallon*, 230 F.3d at 460. There present case provides clear and convincing evidence that returning the L.S. and I.S. to Canada poses a grave risk to them, or else places them in an intolerable situation.

89. Credible testimony adduced at trial established that Petitioner sexually harassed and assaulted A.N. The Court is persuaded by A.N.'s testimony regarding inappropriate touching, as well as Respondent's testimony that Petitioner, with some frequency, sexually and violently ideated about A.N. And Petitioner appeared to admit that he had conducted himself improperly with A.N., including characterizing his own conduct as having "attacked" and "hurt" A.N. in the letter sent to her after Respondent's retention of the children. While A.N. is not the subject of the petition, abuse within the family can constitute a grave risk. *See Ortiz v. Martinez*, 789 F.3d 722, 728 (7th Cir. 2015) ("Sexual abuse most certainly constitutes a 'grave risk' of physical or psychological harm."). While Petitioner may not have been a custodial parent of A.N., the incident to which she testified contributes to finding a grave risk of potential harm to L.S. and I.S or else their placement in an intolerable situation.

90. Credible testimony adduced at trial also established that Petitioner sexually assaulted Respondent. It is true that other courts have found that abuse conduct limited to "private interactions" between parties in a convention case need not sustain a grave risk finding. *See Harvey v. Means*, 2024 WL 324980, at *6 (W.D. Wash. Jan. 29, 2024), *aff'd*, 2025 WL 1189565 (9th Cir. Apr. 24, 2025). But as with A.N.'s testimony, this testimony contributes to Court's finding of a grave risk of potential harm to L.S. and I.S. Again, abuse within the family—including sexual abuse of a custodial parent by another parent—can contribute to a grave risk finding or the finding of an intolerable situation.

91. And Petitioner's history of alcohol use, suicidal ideation, threats to Respondent, and violence all contribute to the Court's conclusion here.

92. Thus, the Court concludes that Respondent has established by clear and convincing evidence that returning L.S. and I.S. to Canada presents a grave risk to their well-being, or else would place them in an intolerable situation.

D. Ameliorative Measures

93. A court may still order the child's return if it determines ameliorative measures would allow both the child's return to his or her home country and the child's protection from harm. *Colchester*, 16 F.4th at 718. District courts have discretion to order such measures, and the Convention imposes no "categorical requirement on a court to consider any or all ameliorative measures before denying return once it finds that a grave risk exists." *Golan*, 596 U.S. at 677–78. Any consideration of ameliorative measures or undertakings "must prioritize the child's physical and psychological safety," may not usurp the custody court's role (in this case, a British Columbian court), and must honor the command that courts "act expeditiously." *Id.* at 680–82 (citation modified). Moreover, a court "reasonably may decline to consider ameliorative measures that have not been raised by the parties, are unworkable, draw the court into determinations properly resolved in custodial proceedings, or risk overly prolonging return proceedings." *Id.* at 682.

94. Here, the Court does not find that the ameliorative measures proposed by Petitioner would ameliorate the risk posed to the children. The central proposal is that Respondent, L.S., and I.S. return to Canada to live on a cottage on the property of Petitioner's mother. *See* Dkt. # 93 at 196:13–197:12. This arrangement would continue while Petitioner initiates a custody case in a Canadian court. *See* Dkt. # 90 at 30 (Petitioner's proposed findings of fact and conclusions of law, detailing ameliorative measures).

95. But Petitioner's mother's testimony established a lack of insight into her son's behavior of the preceding years. She testified that she did not believe that he was dangerous, *see*

Dkt. # 93 at 202:14–22, 222:15–223:1; *cf.* Resp. Ex. 502 (mother's responses to alarming statements by Petitioner, including that he should have gone on a "killing spree"), though other testimony established that he could act dangerously. Without an awareness of the risks posed by her son's behavior, the Court remains concerned as to how she could ensure the children's safety.

96. Furthermore, the Court is concerned that if the children returned to Canada, Respondent would harm them. Notably, there is a Domestic Violence Protection Order in Whatcom County, Washington, Case Number 25-2-02128-37. Dkt. # 58 at 3. And Petitioner testified remotely at the evidentiary hearing. *See* Dkt. # 76.

97. As the First Circuit has noted, "undertakings," an alternative phrasing of ameliorative measures, "are most effective when the goal is to preserve the status quo of the parties prior to the wrongful removal. This, of course, is not the goal in cases where there is evidence that the status quo was abusive." *Danaipour*, 286 F.3d at 25. And further, where evidence of grave risk exists, "it would seem less appropriate for the court to enter extensive undertakings than to deny the return request," because extensive undertakings "embroil the court in the merits of the underlying custody issues" and "dilute the force of the Article 13(b) exception." *Id.* (citation modified). But Petitioner's proposal requires the Court to enter detailed, five-part undertakings to ensure the children's safety. *See* Dkt. # 90 at 30–34. The extensiveness of these proposed undertakings, which may or may not be enforced or enforceable by a British Columbian court, suggests their inappropriateness in this context where the Court finds that a grave risk exception under Article 13(b) exists.

98. Thus, the Court exercises its discretion not to enter ameliorative measures. *Cf. Danaipour v. McLarey*, 386 F.3d 289, 293 (1st Cir. 2004) (no inquiry into ameliorative measures due to a finding of sexual abuse); *Baran v. Beaty*, 479 F. Supp. 2d 1257, 1272–74 (S.D. Ala.

2007), *aff'd*, 526 F.3d 1340 (11th Cir. 2008) (undertakings refused because the court was "powerless" to protect the child from the violent and emotionally unstable father who was intoxicated on a daily basis and threatened the infant's mother, as "elaborately crafted, well-meaning conditions that may or may not be enforced or enforceable by an Australian court"); *Delgado v. Marquez*, 2024 WL 517874, at *12 (N.D. Cal. Feb. 9, 2024) (rejecting proposal because it "merely calls for [the child] to be returned to Mexico and for the parties to submit their dispute to the Mexican family court"); *Kelly & Turner*, 2025 WL 1202043, at *21 (D. Or. Apr. 25, 2025), *aff'd sub nom. Kelly v. Turner*, 2026 WL 1230531 (9th Cir. May 5, 2026) (denying return where father's "longstanding problems with rage and pattern of acts of violence" against mother, which were witnessed by child, established grave risk); *id.* at *22 (rejecting possibility of ameliorative measures due to anger issues).

* * *

For the reasons above, the Verified Amended Petition is DENIED.

Dated this 27th day of October, 2026.

John H. Chun

John H. Chun
United States District Judge